IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Crim. No. 1:16-CR-050-01 |
| | : | |
| **v.** | : | |
| | : | |
| **EARL LAFAYETTE HALL, III** | : | Judge Sylvia H. Rambo |

## M E M O R A N D U M

Before the court are two pretrial motions filed by Defendant Earl Lafayette Hall, III ("Hall" or "Defendant"). Defendant's written pretrial motion raises three issues: (1) the voice identification testimony of Edgar Leon was obtained in violation of Defendant's due process rights; (2) the bank records should be suppressed as the records were obtained in violation of Defendant's Fourth Amendment rights; and (3) the aggravated identity theft counts of the Second Superseding Indictment (Counts 23 through 29) should be dismissed as Defendant is being prosecuted for conduct not covered by 18 U.S.C. § 1028A(a)(1). (Doc. 313.) During the hearing on the aforementioned motion, Defendant set forth orally an additional motion to suppress the voice identification testimony of Edgar Leon because it violated Defendant's Sixth Amendment right to counsel. (*See* Doc. 340.) For the reasons stated herein, the motions will be denied.

## I. Background

On November 9, 2016, Hall and his wife/co-Defendant Renita Blunt ("Blunt"; collectively, "Defendants") were charged in a thirty-one count Second Superseding

1

Indictment comprised of twelve counts of mail fraud in violation of 18 U.S.C. § 1341; ten counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); seven counts of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1); one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349; and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). (Doc. 63.) Defendants are accused of perpetrating a scheme between January 2013 and June 2015 that involved submitting counterfeit United States military discharge certificates bearing the names, dates of birth, and social security numbers of eleven individuals to agencies in various states in order to fraudulently collect unemployment compensation benefits for ex-service members.

Prior to trial, Defendants filed separate motions for severance of trial, which the court denied in an order dated March 1, 2017. (Docs. 92, 96, 111.)

Trial commenced on March 6, 2017. During trial, Hall moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 on all counts except Count 28. The court granted the motion with respect to Counts 25 and 27 for aggravated identity theft, but denied the motion as to all other counts. On March 10, 2017, the jury found Hall guilty of Counts 1 through 12 for mail fraud; Counts 13 through 22 for money laundering; Counts 23, 24, 26, and 28 for aggravated identity theft as to Brandon Abbott, Bryce Good, Shawnta Williams, and Charles Campbell; Count 30 for conspiracy to commit mail fraud; and Count 31 for conspiracy to

commit money laundering. (Doc. 131.) Hall was acquitted of Count 29 for aggravated identity theft. (*Id.*) Defendants subsequently filed post-trial motions, which were denied on December 21, 2017. (Docs. 241-242, 244-245.) Hall was sentenced to 116 months imprisonment on February 15, 2018. (Doc. 272.)

Following sentencing, Defendants appealed their convictions to the Third Circuit Court of Appeals. On July 12, 2019, the Third Circuit issued an opinion reversing the District Court's denial of the motions for severance, vacating Defendants' convictions and sentences, and remanding the matter for new, separate trials. (*See* Doc. 290.) On August 29, 2019, the court issued a scheduling order setting a pretrial motions deadline and trial date. (Doc. 306.) Hall timely filed a motion to suppress on September 16, 2019 (Doc. 313), and a hearing was held on October 7, 2019. At the hearing, Hall made an oral motion to submit an additional and untimely argument regarding the suppression of the voice identifications at issue. The motions are now fully briefed and ripe for disposition.

## II. Discussion

Hall raises four arguments in his pretrial motions, which the court will address in turn.[1]

---

[1] The court will not rule on the merits as to Defendant's oral motion to suppress the voice identification as a violation of his Sixth Amendment right to counsel because the motion was untimely. Defendant failed to make this argument in his timely suppression motion submitted on September 16, 2019, and proceeded to wait until the scheduled hearing three weeks later to raise it orally. Thus, the motion will be denied.

3

### A. Voice identification by Edgar Leon

Edgar Leon ("PO Leon"), Hall's former probation officer, was called by the Government in the March 2017 trial to identify the voice of the caller in recordings from several state agencies that dealt with unemployment benefits for former military members. Hall now challenges PO Leon's voice identification arguing that it violated his due process rights.

Defendant's brief, as well as testimony at the hearing, detailed the history of PO Leon's interactions with Hall, PO Leon's contact with case agents, and Hall's contact with other probation officers. Because the court is writing for the benefit of the parties, it is not going to reiterate every email chain or contact in this memorandum, rather, it will highlight key contacts and generally summarize the communications.

First, the records provided by the United States Probation Office in the Northern District of Illinois ("probation office records") indicate that PO Leon began supervising Hall on November 1, 2011, and concluded his supervision of Hall on December 23, 2013, at which time Hall was reassigned to Probation Officer Christina Figueroa ("PO Figueroa"). (Def. Ex. 102; Doc. 343-2, p. 6 of 11.) PO Figueroa reportedly supervised Hall from December 23, 2013, until his supervision was terminated on April 9, 2015. (Def. Ex. 102; Doc. 343-2, p. 6 of 11.) According

4

to these records, PO Leon had six in person or telephone interactions with Hall, and PO Figueroa had nine such interactions.[2] (Def. Ex. 102.)

Next, the parties provided over one hundred pages of agent notes and email communications between agents and PO Leon and PO Figueroa. (Gov't Ex. 1; Def. Ex. 106.) Agent Joel Parisi ("Agent Parisi") initially contacted PO Figueroa on July 17, 2014. On July 21, 2014, Agent Parisi emailed PO Figueroa two audio recordings to see whether she could identify the voices as Hall or Blunt. PO Figueroa responded the following day stating that PO Leon is "100% sure" that the male voice is Hall but she "could not make the same conclusion as [she had] been supervising [him] for less time." Agent Parisi subsequently began communicating with PO Leon directly regarding the audio recordings and emailed additional recordings for PO Leon to listen to on September 14, 2014. In this and subsequent emails, Agent Parisi specifically asked whether PO Leon could identify the voice of the caller as Earl Hall.

Moving forward, on May 23, 2016, Agent Parisi emailed PO Leon stating he mailed a CD with "all 13 PA telephone calls" to him and summarized nine other calls already emailed to PO Leon. PO Leon responded on May 25, 2016, stating:

> The Hawaii session with Sam Adams did not sound like
> Earl Hall. I cannot, with a high degree of certainty, say that
> was him.

---

[2] These interactions include home and office visits, court appearances, and telephone calls.

> Out of the 13 recordings, I find the following:
> #1 poor recording and can't with certainty say it's Earl Hall.
> #2, #3, #4, #6, #7, #9, #10,
>
> #5 I'm not certain it's Earl Hall
> #8 high degree but not 100% confident
> #11 & #12 the same thing.
> #13 is Renita Blunt

(Def. Ex. 102, p. 106-051.) At the hearing, both PO Leon and Agent Parisi agreed this email was ambiguous and confusing, thus, Agent Parisi asked for clarification via email on May 27, 2016. (*Id.* at 106-052–106-053.) In that email, Agent Parisi reminded PO Leon of the recordings that he previously identified as Hall and noted that "these voice identifications are a very important part of our prosecution, and because we are always mindful of our responsibility to disclose potential *Brady* material to the defense, we want to make absolutely sure we understand your last message." (*Id.* at 106-052.)

On June 21, 2016, PO Leon provided a detailed response regarding each recording:

> With respect to the 6/25/14 recording and after listening to the cd with proper ear phones, my estimation is still 90% certainty that is Earl Hall in the back ground giving Renita Blunt directions and guidance.
>
> 1300569.Adams.DS503648- Sounds like Hall but the voice doesn't sound as deep and as distinct as his previous recordings.

6

> 1300570.Adams.DS503649- same conclusion as previous recording. It sounds like the same person in both, I can say that for sure.
>
> S. Morelan 10/3/14, this is Earl Hall
>
> S. Morelan 9/29/14, this is Earl Hall
>
> C. Campbell 10/20/14, this is Earl Hall
>
> C. Campbell 10/20/14, 1001-1014, this is Earl Hall
>
> C. Campbell 10/20/14, 0949-0950, this is Earl Hall
>
> C. Campbell 10/6/14, this is Earl Hall
>
> C. Campbell 10/3/14, I cannot confirm this is Earl Hall. Voice sounds disguised
>
> C. Campbell 9/22/14, this sounds like Earl Hall
>
> C. Campbell 9/15/14, this sounds like Earl Hall
>
> C. Campbell 7/30/14, 0837, this sounds like Earl Hall
>
> C. Campbell 7/30/14, 0833, this sounds like Earl Hall
>
> C. Campbell 6/30/14, this sounds like Earl Hall (bad recording though)

(*Id.* at 106-060.) PO Leon testified at the suppression hearing that his testimony during the first trial was consistent with his opinions in the June 21, 2016 email. PO Leon further testified that he recalled Hall's voice because it was a "deep resonating voice," "very distinct," had a "deep, rich quality," and "had a tone."

Defendant argues that Agent Parisi's identification procedure, *i.e.* asking if it was Defendant's voice on the calls, was "suggestive, unnecessary, and unreliable, creating the 'substantial likelihood of misidentification.'" (Doc. 314, p. 16 of 28.) Rather than asking if the voice was Defendant's, Defendant submits that Agent Parisi should have presented the recordings and asked if PO Leon recognized the voice. (*Id.* at 17 of 28.) The Government rebuts Defendant's arguments by relying on Federal Rule of Evidence 901 permitting lay person opinion testimony for voice identification and argues that PO Leon's voice identification satisfies the standards set forth in *Neil v. Biggers* and *Manson v. Brathwaite*. (Doc. 333, pp. 1-10.)

The court agrees with the Government that Federal Rule of Evidence 901 permits authentication of a voice through opinion evidence: "An opinion identifying a person's voice--whether heard firsthand or through mechanical or electronic transmission or recording--[can be authenticated] based on hearing the voice at any time under circumstances that connect it with the alleged speaker." FED. R. EVID. 901(a), (b)(5). Thus, while PO Lean is permitted to present lay person opinion testimony regarding the voice identification, the inquiry does not end here.

Both parties rely on the guidance set forth in *Government of Virgin Islands v. Sanes*, 57 F.3d 338 (3d Cir. 1995), regarding determining the reliability of a voice identification. The Third Circuit reviewed the district court's decision to apply the eyewitness identification test articulated in *Neil v. Biggers*, 409 U.S. 188 (1972), and

*Manson v. Brathwaite*, 432 U.S. 98 (1977), to voice identifications. *Sanes*, 57 F.3d at 340. The *Neil* factors include "the opportunity of the witness to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the criminal; the level of certainty demonstrated by the witness at the time of the confrontation; and the length of time between the crime and the confrontation." *Id.* (citing *Neil*, 409 U.S. at 198-200.) The Supreme Court then expanded on *Neil* in *Manson* holding that "admitting testimony even following a suggestive identification procedure does not violate due process if the identification has sufficient indicia of reliability." *Id.* (citing *Manson*, 432 U.S. at 112-16.) The Third Circuit concluded that "the *Neil* and *Manson* eyewitness identification test, adapted to voice identification, provides a standardized source of guidance to district courts for assessing the reliability of voice identification." *Id.*

Here, PO Leon supervised Hall for approximately two years. There was significant debate during the hearing regarding the number of times PO Leon actually heard Hall's voice based on the difference in PO Leon's memory and the probation office records. Based on the probation office records alone, there is no debate that PO Leon heard Hall's voice on at least six occasions. From those six encounters, PO Leon remembered Defendant's voice due to its distinct characteristics. Unlike the witness in *Sanes*, PO Leon was not a victim of a crime and heard Defendant's voice during times that would require a degree of attention

9

from PO Leon, *i.e.* while conducting home visits, meeting with Hall in the office, attending court proceedings, and discussing Hall's supervision on the telephone. Additionally, from the first emailed recording sent to PO Figueroa, PO Leon identified Defendant's voice. Although some of PO Leon's emails sparked confusion, he never wavered in identifying Hall's voice in some of the recordings.

Defendant believes that Agent Parisi should have presented the recordings with the open-ended question of "Do you recognize this voice?" However, neither party has provided case law requiring such a question or that a voice array be presented to a witness. Furthermore, it is of no moment that PO Figueroa could not identify Hall's voice. As discussed, voice identification is opinion testimony and there are many possible reasons why PO Figueroa could not identify the voice on the recordings while PO Leon could.

Accordingly, the court finds that there is a sufficient indicia of reliability in PO Leon's voice identifications such that the testimony may be presented at trial. There, the jury can make the appropriate determination as to credibility, weight, and reliability of PO Leon's testimony. Thus, Defendant's motion will be denied.

## B. <u>Bank records</u>

Next, Hall argues that his bank records obtained via subpoena should be suppressed because the failure to obtain a search warrant violated his Fourth Amendment rights. Hall relies on the Supreme Court's recent decision in *Carpenter*

*v. United States*, 138 S. Ct. 2206, 2216 (2018), which examined "the ability to chronicle a person's past movements through the record of his cell phone signals." Cell-site location information is a time-stamped record that is generated each time a phone connects to a cell site. *Id.* at 2211-12. This information is collected and stored by wireless carriers for business purposes. *Id.* at 2212. The Court declined to extend the third-party doctrine, *i.e.* that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties," to cover the "novel circumstances" of cell phone location records. *Id.* at 2216-17. Ultimately, the Supreme Court held that individuals have a legitimate expectation of privacy in their cell-site location information and obtaining this information constitutes a search requiring a warrant. *Id.* at 2220.

Applying this same principal to bank records, Defendant argues that bank records, like cell-site location information, are "footprint[s] of our daily lives." (Doc. 314, p. 20 of 28.) He did not voluntarily "share" his location by using his bank card and has a legitimate expectation of privacy in his bank records. (*Id.* at 23 of 28.) The Government rebuts the application of *Carpenter* by highlighting the Supreme Court's own language: "Our decision today is a narrow one. . . . We do not disturb the application of *Smith* or *Miller* or call into question conventional surveillance techniques and tools, such as security cameras. Nor do we address other business

11

records that might incidentally reveal location information." (Doc. 333, p. 11 of 18 (quoting *Carpenter*, 138 S. Ct. at 2220).)

Given *Carpenter's* narrow holding, the court finds that a subpoena was sufficient to obtain Hall's bank records. Accordingly, Defendant's motion to suppress will be denied in this regard.

### C. **Aggravated identity theft counts**

Defendant's final argument is that Counts 23 through 29 for aggravated identity theft should be dismissed because the charged conduct is not an offense under 18 U.S.C. § 1028A(a)(1). (Doc. 314, pp. 24-27 of 28.) More specifically, Hall contends that § 1028A(a)(1) does not permit the prosecution of an individual for using "false identification documents;" rather, only § 1028A(a)(2) contains this language and permits prosecution in relation to a terrorism offense. (*Id.* at p. 25 of 28.) The Government argues that Hall's interpretation of the statute is misplaced because the "in general" provision permits prosecution when using "a means of identification of another person." (Doc. 333, pp. 12-13.)

There are two offenses detailed in § 1028A for aggravated identity theft. The "in general" offense provides: "Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, *a means of identification of another person* shall, in addition to the punishment provided for such felony, be sentenced to a term of

12

imprisonment of 2 years." 18 U.S.C. §1028A(a)(1) (emphasis added). Subsection (c) includes mail, bank, and wire fraud as enumerated offenses. § 1028A(c)(5). "Means of identification" is also defined by statute as:

> *any name or number that may be used, alone or in conjunction with any other information*, to identify a specific individual, including any--
> (A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;
> (B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;
> (C) unique electronic identification number, address, or routing code; or
> (D) telecommunication identifying information or access device (as defined in section 1029(e)).

§ 1028(d)(7) (emphasis added) (providing that the definitions in subsection (d) apply to § 1028 and § 1028A). In *United States v. Mitchell*, the Fourth Circuit examined the meaning of the phrase "a means of identification of another person," stating: "The definition, in other words, allows for an identifier, taken alone or together with other information, to qualify as a means of identification *so long as the sum total of information identifies a specific individual.*" 518 F.3d 230, 234 (4th Cir. 2008); *see also United States v. Brown*, 430 F. App'x 198, 200 (3d Cir. 2011) (finding that the first name, last name, and date of birth of victim was sufficient means of identification of another person); *United States v. Graham*, 486 F. App'x 265, 270

13

n.9 (3d Cir. 2012) (noting that a false driver's license bearing the name and address of an actual person is a means of identification of another).

Differently, the "terrorism offense" that Defendant references requires that during and in relation to a felony under 18 U.S.C. § 2332b ("Acts of terrorism transcending national boundaries"), a defendant will be sentenced to a term of imprisonment of five years for knowingly transferring, possessing, or using "a means of identification of another person or a false identification document." A "false identification document," simply means "a document of a type intended or commonly accepted for the purposes of identification," but the personal identifiers are not required to actually belong to another person. 18 U.S.C. § 1028(d)(4).

In the Second Superseding Indictment, each count of aggravated identity theft contains the following:

> [Defendants] did, during and in relation to a felony violation; to wit; Mail Fraud, as described in Counts 1 – 12 of this Indictment, knowingly transfer, possess, and use, without lawful authority, *a means of identification of another person*, and did aid and abet same; to wit, in that EARL HALL and RENITA BLUNT submitted *counterfeit DD 214 Forms bearing the names and identities of other individuals* to the PA Department of Labor & Industry (PDOLI) in connection with false and fraudulent claims for UCX benefits . . .

(Doc. 63, pp. 11-12 (emphasis added).) The Government avers that the DD-214 forms contain first and last names, dates of birth, and social security numbers from each alleged aggravated identity theft victim. (Doc. 333, p. 16.) Following *Mitchell's*

14

guidance, the DD-214 forms, if provided and admitted at trial, are sufficient to qualify as a means of identification given the totality of information that identifies a specific individual. Thus, Defendant's motion will be denied in this regard.

## III. <u>**Conclusion**</u>

For the reasons stated herein, Defendant's pretrial motions will be denied. An appropriate order will follow.

s/Sylvia Rambo  
SYLVIA H. RAMBO  
United States District Judge

Dated: November 12, 2019